Filed 8/20/21

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re N.F., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E076330 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ1600422) |
| v. | OPINION |
| E.G., et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County. Matthew C. Perantoni, Judge. Dismissed in part and affirmed.

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant E.G.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant, D.F.

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II of the Discussion.

1

Gregory P. Priamos, County Counsel, James E. Brown, Anna M. Marchand and Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

Months after the juvenile court denied E.G. (Mother) reunification services, Mother filed a petition under Welfare and Institutions Code section 388 (unlabeled statutory citations refer to this code) asking for reunification services. The court denied the petition and terminated parental rights to Mother's daughter, N.F. Mother argues that the court abused its discretion by denying her section 388 petition. Both Mother and D.F. (Father) argue that the court erred by refusing to apply the parental bond exception to termination of parental rights. (§ 366.26, subd. (c)(1)(B)(i).)

In the published portion of this opinion, we hold that the court did not abuse its discretion by denying Mother's section 388 petition. Mother failed to show (1) a material change in circumstances or (2) that granting Mother reunification services would promote N.F.'s best interests. In the unpublished portion of the opinion, we conclude that the court did not err by refusing to apply the parental bond exception. Accordingly, we affirm the order denying Mother's petition and affirm the order terminating parental rights.

BACKGROUND

I. *Prior Dependency Case*

The family came to the attention of the Riverside County Department of Public Social Services (DPSS) in May 2016. Mother and N.F. tested positive for methamphetamine and amphetamine at N.F.'s birth. Mother was 25 years old and had been using methamphetamine since age 18. She admitted to using throughout her

pregnancy. Father reported drinking 12 beers per day on the weekends and using marijuana. The parents were not married and did not live together. Father was unsure whether he could care for N.F.

DPSS filed a petition under section 300, subdivisions (b) and (g), and the court detained N.F. from the parents. At the jurisdiction and disposition hearing in June 2016, the court found true the allegations under section 300, subdivision (b), that both parents had substance abuse problems and that Father had stated he was unable and unwilling to care for N.F. The court removed N.F. from the parents' custody and ordered reunification services for both parents.

Mother received reunification services until the six-month review hearing, at which N.F. was returned to Mother, and roughly 32 months of family maintenance services after that. Father received reunification services until the 18-month review hearing, at which N.F. was placed with both Mother and Father, and roughly 19 months of family maintenance services after that. When the court returned N.F. to Mother at the six-month review hearing, the court placed N.F. with Mother on the condition that Mother reside with maternal grandmother. N.F. had three placements before her return to Mother's care.[1]

In August 2019, after the parents had received services for over three years, the court granted the parents joint legal and physical custody of N.F. and terminated jurisdiction.

_____

[1] While DPSS's report stated that N.F. had been in four out-of-home placements, the accompanying description of her placements identified only three homes.

During the 2016-2019 case, Mother maintained periods of sobriety while she was in treatment and drug testing regularly, but she relapsed several times. In August 2016, she completed a 45-day residential treatment program. After that, she finished phase one of the substance abuse program through family preservation court, but she was unable to complete the entire program because of conflicts with her work schedule. In October 2017, she tested positive for methamphetamine, and she started an outpatient treatment program the following month. It is unclear from the record whether she completed that program. In April 2018, she again tested positive for methamphetamine and started an outpatient program. Mother missed too many group sessions and did not complete that program on time, but she eventually completed it in March 2019.

Father completed an outpatient substance abuse treatment program in December 2016. N.F. did not reside with Father during the 2016-2019 case, but he visited the child. The social worker noted that Father was "not the primary caregiver for the child" and that he had "never lived with or provided care for the child by himself."

II. *Detention in the Present Case*

The present case began five months after the court terminated jurisdiction in the first case. In January 2020, DPSS received a referral alleging that Mother had relapsed and crashed her car several times while driving with N.F. When DPSS interviewed Mother, she tested positive for methamphetamine and amphetamine and admitted to using within the last several days. She said that she had gotten into a car accident in February 2019 but denied that she was under the influence at the time. Mother had been

4

charged in June 2019 with burglary and unauthorized use of another's personal identifying information to obtain credit. (Pen. Code, §§ 459, 530.5, subd. (a).)

Mother reported that Father got "drunk" every weekend and that she did not allow him to have unsupervised visits with N.F. She also claimed that Father had a history of domestic violence and described a December 2019 incident in which Father was verbally aggressive and threw her cell phone across the neighbor's yard.

Father reported that he was concerned about Mother's methamphetamine use, but he did not think that he could care for N.F. by himself. He admitted to having "'an alcohol issue.'" He had recently received a citation for possessing an open container of alcohol while driving. (Veh. Code, § 23222, subd. (a).)

In February 2020, DPSS filed a petition under section 300, subdivision (b), and the court detained three-year-old N.F. from the parents. The court ordered supervised visitation at least twice per week for both parents. DPSS placed N.F. in a foster home.

III. *Jurisdiction and Disposition*

When interviewed for the jurisdiction and disposition report, Mother indicated that she had relapsed four or five months after completing her last outpatient program. Mother reported that she had been using methamphetamine "off and on" since age 18 or 19. She described another domestic violence incident in which Father choked her and pushed her into a door.

Father reported that he had been drinking since age 15. The night before his interview with the social worker, Father had shared a 12-pack of beer with his brother. Father said that he had been sober for five months and started drinking again because he

5

was stressed about Mother's relapse. He denied any domestic violence but also said that "a long time ago," he broke Mother's windshield after she broke his cell phone. N.F. stayed with him during the weekends after the court ordered joint legal and physical custody. Paternal grandmother helped him care for N.F.

In February 2020, Father visited N.F. three times and missed three visits. During the first visit, he seemed tired and lay on the floor while N.F. played with toys. He engaged with N.F. during most of the second visit but was also on his cell phone. He interacted with N.F. appropriately and was attentive during the third visit.

During the same period, Mother visited N.F. five times and missed one visit. At two of the visits, Mother tested positive for methamphetamine and amphetamine but did not appear to be under the influence. Mother was generally attentive to N.F.'s needs and interacted appropriately with the child.

At the jurisdiction hearing in March 2020, the court found the following allegations true: (1) Mother had an unresolved history of abusing methamphetamine and continued to use while caring for N.F.; (2) Father had an unresolved history of abusing alcohol and continued to abuse it while caring for N.F.; (3) each parent knew or reasonably should have known of the other's substance abuse and failed to protect N.F.; (4) both parents had a dependency history and received services from May 2016 to August 2019; and (5) Mother had a criminal history.

In an addendum report prepared for the disposition hearing, DPSS reported that Mother had started another outpatient program. Mother indicated that she had been drinking beer every day and had replaced methamphetamine with marijuana.

Mother had six more visits before the disposition hearing, and Father had five more visits during the same period. Both parents were appropriate and attentive to N.F., and the child's caregiver (who was supervising) reported no concerns.

The court continued the disposition hearing several times. In March 2020, in-person visits were suspended because of the Covid-19 pandemic, and the parents had supervised video calls with N.F. from March to June 2020. The parents did not use their entire hour for the video visits, but the caregiver reported no concerns with their interactions. The social worker opined that N.F. was well bonded with both parents.

Mother stopped her outpatient program and started a 90-day residential treatment program in April 2020. Her drug test results were all negative in May and June 2020. The provider reported in June 2020 that Mother was meeting all of her treatment plan goals.

At the disposition hearing in June 2020, the court removed N.F. from the parents' custody and denied them reunification services under section 361.5, subdivision (b)(13). The court reduced the parents' visitation to once per week and set the matter for a section 366.26 hearing.

IV. *Section 388 Petitions and Section 366.26 Proceedings*

In July 2020, DPSS placed N.F. with maternal relatives who wanted to adopt the child. By October, N.F. had adjusted well to the placement and was thriving in the home. N.F. was well behaved and did not display any mental or emotional problems. The caregivers and N.F. were well bonded. The caregivers loved N.F., and the child sought them out for comfort, attention, and affection. The preliminary adoption assessment

described their home as safe, stable, nurturing, and loving. The caregivers were committed to providing N.F. with a permanent home.

One of the caregivers supervised the parents' visits. Mother visited approximately once per week, and Father visited once every other week. N.F. enjoyed seeing the parents, and the visits went well. Both parents called N.F. twice per day, once in the morning and once in the evening. But Mother stopped visiting in September 2020 because she was incarcerated and charged with possession of a controlled substance.

In October 2020, Father filed a section 388 petition requesting family maintenance services or, in the alternative, family reunification services. That same month, because Mother was still incarcerated, the court continued the section 366.26 hearing to arrange for Mother's appearance.

DPSS's addendum report indicated that Father visited N.F. twice per month and called her once per week. He wanted to visit more often, but his job prevented him from doing so. As of late November 2020, Mother was still incarcerated, and DPSS did not know when she would be released.

In December 2020, Mother filed a section 388 petition requesting six months of reunification services. Mother argued that she had a significant bond with N.F. and had maintained visitation with the child. She submitted a letter from her 90-day residential treatment program showing that she had successfully completed the program in July 2020. Mother wrote a letter to the court acknowledging that she had "some problems with the law," but she said that she had been sober since completing her program. The petition also stated the Mother had stable housing and employment. Mother's letter

8

indicated that she had renewed her cosmetology license and was working as a cosmetologist. She submitted an electricity bill as proof of her housing, but the bill showed that her electricity was going to be disconnected immediately unless she paid the past due amount of over $600.

The section 366.26 hearing and the hearing on the parents' petitions occurred on the same date in December 2020. Father testified in support of his petition. He was due to complete a six-month outpatient program at the end of the month and had been sober for those six months. He visited N.F. once per week and had video calls with her twice each day. N.F. ran to him at visits, called him "Daddy," and showed him love and affection. He brought snacks, treats, and toys to visits, and he tried to do fun and educational activities with her. He loved N.F. and believed that they had a strong bond.

The court denied both parents' section 388 petitions.[2] As to Mother, the court found that her circumstances were "changing" but "not changed" for purposes of section 388. The court also found that it was not in N.F.'s best interests to grant the petition. The court noted that four-year-old N.F. had been in numerous placements since her birth and was finally in a stable home with relatives who were committed to adoption. The court found that N.F.'s best interests were served by remaining in that home.

Mother testified when the court proceeded to the section 366.26 hearing. Mother believed that she had a strong bond and a loving relationship with N.F. She visited N.F.

---

[2] Although Father's notice of appeal states that he is appealing from the order terminating parental rights and the denial of his section 388 petition, he does not raise any arguments about the denial of his petition. Accordingly, we dismiss as abandoned Father's appeal from the order denying his section 388 petition.

once per week for one hour and called the child every day. N.F. called her "mommy." Whenever N.F. saw Mother at visits, the child was "super happy" and started jumping. She wanted Mother to hold her constantly. At the end of Mother's visits, N.F. got "really sad." Mother brought the child snacks and toys, and they sang the child's favorite song. N.F. gave Mother things that the child had made at school. Over the phone, Mother had N.F. practice spelling and writing her own name and Mother's name. Mother loved N.F. and preferred a permanent plan of legal guardianship until she could have the child returned to her care.

The court admitted Father's testimony in support of his section 388 petition for purposes of the section 366.26 hearing as well. Both parents asked the court to apply the parental bond exception to termination of parental rights. The court observed: "[T]his one is probably harder than most because it is obvious to the Court how much both mother and father clearly love and care for their child. Nevertheless, the Court is required to follow the law." The court found that N.F. was likely to be adopted, termination of parental rights would not be detrimental to N.F., and none of the statutory exceptions applied. The court terminated parental rights.

DISCUSSION

I. *Mother's Section 388 Petition*

Mother argues that the court abused its discretion by denying her section 388 petition. We are not persuaded.

Section 388 permits the parent of a dependent child to petition the juvenile court for a hearing to modify an earlier order on the basis of changed circumstances or new

10

evidence.  (§ 388, subd. (a)(1).)  The petitioning party bears the burden of showing that there is new evidence or changed circumstances and that the proposed modification would be in the best interests of the child.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

In determining whether the petitioning party has carried his or her burden, "the court may consider the entire factual and procedural history of the case."  (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.)  "Whether the juvenile court should modify a previously made order rests within its discretion, and its determination may not be disturbed unless there has been a clear abuse of discretion."  (*In re J.C.* (2014) 226 Cal.App.4th 503, 525.)

"Not every change in circumstance can justify modification of a prior order."  (*In re S.R.* (2009) 173 Cal.App.4th 864, 870.)  The change in circumstances supporting a section 388 petition must be material.  (See *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223 [requiring a "substantial change of circumstances"]; *In re Mickel O.* (2011) 197 Cal.App.4th 586, 615 [requiring the change in circumstances to be "'significant'" in nature].)  In the context of a substance abuse problem that has repeatedly resisted treatment in the past, a showing of materially changed circumstances requires more than a relatively brief period of sobriety or participation in yet another program.  (E.g., *In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1081 [parents' most recent efforts at sobriety "were only three months old" and did not demonstrate changed circumstances]; *In re Clifton B.* (2000) 81 Cal.App.4th 415, 423 [parent's seven months of sobriety since his last relapse were insufficient to show changed circumstances, given the parent's history]; *In*

*re Kimberly F.* (1997) 56 Cal.App.4th 519, 531, fn. 9 ["It is the nature of addiction that one must be 'clean' for a much longer period than 120 days to show real reform"].)[3]

As to the best interests element, after the court has bypassed or terminated reunification services and set the matter for a section 366.26 hearing, the focus of the case shifts from the parents' interest in the care, custody, and companionship of the child to the needs of the child for permanency and stability. (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317; *In re J.C.*, *supra*, 226 Cal.App.4th at p. 527.) A court entertaining a section 388 petition at this stage in the proceedings "must recognize this shift of focus in determining the ultimate question before it, that is, the best interest of the child." (*In re Stephanie M.*, at p. 317.)

The court did not abuse its discretion by denying Mother's section 388 petition here. First, the court properly concluded that Mother failed to establish sufficiently changed circumstances. Mother introduced evidence that she completed a 90-day residential treatment program in July 2020. Although that was a nominal change since the court had bypassed reunification services in June 2020, the change was not material.

---

[3]    The trial court determined that mother's evidence showed circumstances that were "changing" but not yet "changed," applying a distinction that is frequently drawn in cases concerning section 388. (See *In re Alayah J.* (2017) 9 Cal.App.5th 469, 482; *In re Ernesto R.*, *supra*, 230 Cal.App.4th at p. 223; *In re Mickel O.*, *supra*, 197 Cal.App.4th at p. 615; *In re Casey D.* (1999) 70 Cal.App.4th 38, 47, 49, disapproved of on another ground by *In re Caden C.* (2021) 11 Cal.5th 614, 636, fn. 5 (*Caden C.*).) The case law's references to "changed" and merely "changing" circumstances are another way of describing the distinction on which we rely, between changes that are material and those that are not. However expressed, the point is that section 388 requires a change that is relevant and substantial (rather than irrelevant or de minimis) when considered in light of all of the circumstances of the case.

The record discloses that Mother had a history of completing programs and then relapsing. She completed programs and relapsed at least twice during the first case. In the present case, she admitted that she relapsed four or five months after completing her last program in March 2019. That means that she relapsed around the time the court terminated jurisdiction in the first case (August 2019). And even if she achieved another period of sobriety while in the latest 90-day program, there was conflicting evidence about her sobriety after that: She claimed to have been sober since her release from the program in July 2020, but she was charged with possession of a controlled substance in September 2020, undermining her claim of sobriety. On this record, Mother's brief period of sobriety and completion of a treatment program was only the most recent attempt in a series of unsuccessful attempts to overcome her substance abuse. Given Mother's history, her recent completion of yet another program did not constitute a material change in circumstances.

Moreover, Mother's assertions that she was working as a cosmetologist and had housing did not establish material changes within the meaning of section 388. The court denied her reunification services because of her unresolved history of substance abuse. (§ 361.5, subd. (b)(13).) Without a showing that her substance abuse had materially changed, the changes concerning her housing and employment could not support her petition.

Second, the court reasonably determined that granting Mother reunification services would not promote N.F.'s best interests. N.F. had been in Mother's care for approximately two and one-half years during the first case, but the child had also seen

numerous foster care placements during her four years.  At the time of the section 388 hearing, N.F. had been with her caregivers for roughly five months.  She was thriving in their stable home and was bonded to them.  They loved her and were committed to providing her permanency through adoption.  In contrast, Mother's circumstances were unstable.  There was no telling whether her latest efforts at sobriety would be lasting.  Mother thus failed to establish that N.F.'s "best interests in *permanency and stability* would be furthered by" derailing the child's adoption.  (*In re J.C.*, *supra*, 226 Cal.App.4th at p. 526.)

Mother argues that the court should have granted her petition because she made a prima facie showing on both the changed circumstances and the best interests elements.  But the prima facie showing merely triggers the right to a "full hearing" on the petition.  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310.)  Mother received a full hearing on her petition.  To be entitled to the requested relief, Mother had to make the required showings by a preponderance of the evidence.  (*In re Mickel O.*, *supra*, 197 Cal.App.4th at p. 615.)  Mother does not argue that she carried that burden, and for the reasons already discussed, she did not.

In sum, the court did not abuse its discretion by denying Mother's section 388 petition.  Mother failed to show materially changed circumstances or that the requested change would promote N.F.'s best interests.

II. *Parental Bond Exception*

Both parents argue that the juvenile court erred by terminating their parental rights because the parental bond exception applied.  We disagree.

14

When the juvenile court finds that a dependent child is likely to be adopted, it must terminate parental rights and select adoption as the permanent plan unless it finds that termination would be detrimental to the child under one of several exceptions. (§ 366.26, subd. (c)(1); *Caden C.*, *supra*, 11 Cal.5th at pp. 630-631.) If the child is likely to be adopted, "adoption is the norm." (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) "[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350, disapproved of on another ground by *Caden C.*, at p. 636, fn. 5.)

Under the parental bond exception, the parent bears the burden of proving three elements: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631 [construing § 366.26, subd. (c)(1)(B)(i)].)

The substantial evidence standard of review applies to the court's findings on whether the parent has regularly visited and whether a beneficial parental relationship exists. (*Caden C.*, *supra*, 11 Cal.5th at p. 639.) Whether termination of parental rights would be detrimental to the child because of the beneficial parental relationship is a discretionary decision that we review for abuse of discretion. (*Id.* at p. 640.)

The parent must show that his or her relationship with the child "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27

15

Cal.App.4th 567, 575.) "A showing the child derives some benefit from the relationship is not a sufficient ground to depart from the statutory preference for adoption. [Citation.] No matter how loving and frequent the contact, and notwithstanding the existence of an '"emotional bond"' with the child, '"the parents must show that they occupy 'a parental role' in the child's life."'" (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 646, disapproved of on other grounds by *Caden C.*, *supra*, 11 Cal.5th at pp. 637, 638, fns. 6, 7.)

In determining whether the parental bond exception applies, "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

In this case, the court did not abuse its discretion by concluding that the parental bond exception did not apply. Both parents regularly visited N.F., although Father missed a number of visits early in the case, and Mother missed a number of visits during her incarceration. Both parents also maintained regular contact with N.F. through telephone or video calls. The record discloses that N.F. was excited to see them at visits, those visits went well, and at least as to Mother, N.F. was sad when the visits ended. The evidence thus showed that the parents shared an emotional bond with N.F.

But the parents had to show more than frequent and loving contact and an emotional bond. They had to show that they occupied "'a parental role' in [N.F.'s] life."

16

(*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108.)  There was no evidence that Father occupied such a role.  N.F. never lived with Father.  He visited the child during the prior case, and in the five months between cases, she stayed with him only during the weekends.  In the present case, he never progressed beyond supervised visitation.  "[A] child should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree but does not meet the child's need for a parent."  (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350.)

Moreover, assuming for the sake of argument that Mother came closer than Father to occupying a parental role in N.F.'s life, neither parent demonstrated that his or her relationship with N.F. was so significant that severance of the relationship would greatly harm the child.  N.F. may have been sad at the end of her visits with Mother, but the child did not exhibit any mental, emotional, or behavioral difficulties in the caregivers' home.  Instead, N.F. was thriving in the home of the extended maternal relatives, who loved her and were committed to adoption.  N.F. and the caregivers were bonded.  She sought them out for comfort, attention, and affection.  There was no evidence that termination of parental rights would harm N.F. so severely as to "'outweigh the sense of security and belonging an adoptive home would provide.'"  (*In re Jason J.* (2009) 175 Cal.App.4th 922, 938.)

Both parents argue that the court should have chosen a permanent plan of legal guardianship because of their relationship with N.F.  But under section 366.26, subdivision (c)(4), the court may select legal guardianship as the permanent plan only if it has rejected adoption "due to the applicability of statutory exceptions."  (*In re Keyonie*

17

*R.* (1996) 42 Cal.App.4th 1569, 1573; *In re Cody W.* (1994) 31 Cal.App.4th 221, 231.)

No statutory exception to termination of parental rights applied here, so the juvenile court did not err by failing to select legal guardianship as the permanent plan.

For all of these reasons, the juvenile court did not abuse its discretion by concluding that the benefit N.F. would receive from adoption outweighed any detriment that the child might suffer from termination of Mother's and Father's parental rights.

## DISPOSITION

The order denying Mother's section 388 petition is affirmed.  The appeal from the order denying Father's section 388 petition is dismissed as abandoned.  The order terminating parental rights is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

MENETREZ
J.


We concur:

RAMIREZ
P. J.

McKINSTER
J.